# In the United States Court of Federal Claims

No. 18-365
Filed: April 19, 2021
FOR PUBLICATION

---

**LEON LANDA,**

                    *Plaintiff,*

**v.**

**UNITED STATES,**

                    *Defendant.*

---

*M. Bradford Randolph*, M. Bradford Randolph, Esq. PLLC, New York, NY, for the plaintiff.

*Miranda Bureau*, Tax Division, U.S. Department of Justice, Washington, D.C., with whom was *G. Robson Stewart*, of counsel, for the defendant.

## MEMORANDUM OPINION

***HERTLING*, Judge**

In 2009, the plaintiff, Leon Landa, opened a bank account in Switzerland under his own name. He subsequently failed to file with the IRS for 2009 a timely Report of Foreign Bank and Financial Accounts ("FBAR"). U.S. citizens who hold foreign bank accounts are required by law to file an FBAR annually. The plaintiff challenges a civil penalty imposed on him by the defendant, the United States, acting through the Internal Revenue Service ("IRS"), pursuant to the Bank Secrecy Act, 31 U.S.C. § 5321. The IRS imposed the civil penalty due to the plaintiff's failure to file a timely FBAR for 2009.

The plaintiff argues that the FBAR-filing requirement did not apply to him in 2009 because he had no financial interest in the foreign bank account. According to the plaintiff, the account was held in trust for his family's benefit, and under Swiss law he was not the true account owner. He challenges the imposition of the FBAR penalty on two grounds: first, his FBAR filing for 2009 was timely under U.S. Treasury Notice 2010-23; second, the penalty imposed violates the excessive fines clause of the eighth amendment to the U.S. Constitution.

The defendant has moved for summary judgment pursuant to Rule 56 of the Rules of the Court of Federal Claims ("RCFC"), arguing that the FBAR penalty was properly imposed and is not an excessive fine under the eighth amendment. The Court grants the defendant's motion for summary judgment.

## I.      BACKGROUND

### A.      Legal Background

The Bank Secrecy Act, codified at 31 U.S.C. § 5311 *et seq.*, was enacted by Congress in 1970 to discourage abuse of foreign financial facilities to evade U.S. law.  The Bank Secrecy Act seeks to curb tax evasion by ensuring that U.S. citizens pay taxes on income earned abroad.  *See* H.R. Rep. No. 91-975 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4394, 4397-98 (noting that "[s]ecret foreign financial facilities" offered a "grossly unfair" but "convenient avenue of tax evasion").

The Bank Secrecy Act requires U.S. citizens and residents to keep records and file reports with the Treasury Department when that "resident, citizen, or person makes a transaction or maintains a relation for any person with a foreign financial agency."  31 U.S.C. § 5314.  One such report is the "Report of Foreign Bank and Financial Accounts" (Form TD F 90-22.1), commonly referred to as the "FBAR."  Regulations implementing the Bank Secrecy Act require that "[e]ach person subject to the jurisdiction of the United States . . . having a financial interest in, or signature or other authority over, a bank, securities or other financial account in a foreign country" file an FBAR.  31 C.F.R. § 103.24 (effective to February 28, 2011).[1]

An individual required to file an FBAR must do so on or before June 30 of the year following the calendar year for which the report is made.  An individual must file an FBAR for any foreign financial account with a balance exceeding $10,000 at the close of the relevant calendar year.  *Id.* § 103.27(c) (2009).  "The familiar Form 1040, used by every United States resident filing a personal federal income tax return, includes Schedule B, which contains a check-the-box question that puts a taxpayer on notice [that an FBAR must be filed]."  *Kimble v. United States*, 991 F.3d 1238, 1242 (Fed. Cir. 2021).  The 2009 Form 1040 Schedule B contained this check-the-box question.  (ECF 46-2, Def's Ex. 22, A132.)

The Bank Secrecy Act grants the Secretary of the Treasury the authority to impose a "civil money penalty" on any person who fails to file a required FBAR.  31 U.S.C. § 5321(a)(5).  The Secretary delegated this authority to the IRS.  31 C.F.R. § 103.56(g).

Historically, "[f]rom 1986 to 2004, § 5321 only authorized penalties for willful violations of § 5314 and capped such penalties at $100,000.  In 2004, Congress amended § 5321 to authorize penalties up to $10,000 for non-willful violations of § 5321 and to increase the

---

[1] In 2010, all regulations related to the Bank Secrecy Act were relocated to a new chapter of title 31 of the Code of Federal Regulations; the relocation took effect in 2011.  *See* Transfer and Reorganization of Bank Secrecy Act Regulations, 75 Fed. Reg. 65806 (Oct. 26, 2010); 31 C.F.R. §§ 1010.350(a) (2011), 1010.306(c) (2011).  Because this case involves a penalty related to a 2009 FBAR, citations to the Code of Federal Regulations will reference the regulations in place prior to the 2011 reorganization.

maximum penalty for willful violations . . . ." *Norman v. United States*, 942 F.3d 1111, 1114 (2019) (citing 31 U.S.C. § 5321(a)(5)(A)-(D)).

As amended in 2004, the Bank Secrecy Act authorizes the IRS to impose an increased civil money penalty for a willful violation of section 5314:

> (i) the maximum penalty under subparagraph (B)(i) shall be increased to the greater of--
>
> (I) $100,000, or
>
> (II) 50 percent of the amount determined under subparagraph (D) . . . .

31 U.S.C. § 5321(a)(5)(C).

Subparagraph (D) specifies that "in the case of a violation involving a failure to report the existence of an account or any identifying information required to be provided with respect to an account," the 50-percent penalty shall be assessed in regard to "the balance in the account at the time of the violation." *Id.* § 5321(a)(5)(D). Section 5321 thus increased the maximum penalty for a willful violation of the FBAR-filing requirement to $100,000 or 50 percent of the account balance. *Id.* § 5321(a)(5)(C)-(D).

Willful violations are exempted from subparagraph (B)(ii), which provides an exception to the penalty if the account balance was properly reported. *Id.* The term "willful" is not defined in the statute.

## B.      Factual Background

The plaintiff emigrated to the United States from Ukraine, by way of Israel and Belgium, in 1975 with his father, Gersh Landa; his mother; and his brother, Mark. (ECF 53-4, L. Landa Dep. 17:2-18:24.) The plaintiff became a U.S. citizen in 1980. (*Id.* at 18:25-19:4.)

In early 1980, the plaintiff learned from his father that the plaintiff's grandfather had deposited money into an account in Switzerland during World War II. (*Id.* at 19:23-20:4.) The money left by Mr. Landa's grandfather was apparently intended to be money "for the family" to be preserved and used for emergencies "in case another situation like World War II . . . happen[ed]." (*Id.* at 20:19-21:18.) It had been deposited in Switzerland because that country was "neutral." (*Id.*) Mr. Landa's father did not locate the Swiss account until 1980, and Mr. Landa was unaware of the account until that time. (*Id.* at 20:19-21:3.)

The plaintiff's grandfather initially deposited the funds in 1939 with Banca Popolare Svizzera, which later merged with Credit Suisse AG ("Credit Suisse"). (ECF 53-6, Pl.'s Ex. 6 at

6.[2])  After the plaintiff's father located the account, the funds were held in Switzerland in accounts at Credit Suisse and UBS AG ("UBS") by the plaintiff's father.  (L. Landa Dep. 149:4-17.)

In 1985, Mr. Landa and his father traveled to Switzerland to monitor the accounts.  His father gave Mr. Landa, Mr. Landa's brother, and mother power of attorney on the UBS account in 1985 and a power of attorney on the account at Credit Suisse in 1998.  (*Id.* at 23:1-18; ECF 46-2, Def.'s Exs. 30 & 31, A202-03.[3])

The Landa family has run a wholesale supply company to the jewelry and diamond industry since approximately 1980.  (ECF 53-5, M. Landa Dep. 21:1-21.)  Starting in the 1980s, the plaintiff's father traveled annually with the plaintiff to Zurich, Switzerland, to attend a jeweler's convention in Basel, Switzerland, and to monitor the accounts at Credit Suisse and UBS.  (L. Landa Dep. 25:22-28:19).  Mr. Landa and his brother took over management of the jewelry-supply business in 2001.  (Am. Compl. ¶ 5.)

Around 2005, Gersh Landa's health began to deteriorate, and travel to Switzerland grew difficult.  (L. Landa Dep. 44:7-45:23; 45:24-46:11.)  The plaintiff and his father made their last joint trip to Switzerland in 2006.  (*Id.* at 45:24-46:11.)  At that time, approximately $1.2 million was transferred from the UBS account to the Credit Suisse account.  (Def.'s Ex. 28, A158.)  In 2007, Mr. Landa returned to Zurich by himself to check on the accounts.  During that trip he secured confirmation that the 2006 transfer of funds from UBS to Credit Suisse had been effectuated.  (L. Landa Dep. 41:21-42:25.)  While visiting UBS in 2007, Mr. Landa signed an investment direction to extend a fiduciary deposit automatically every three months.  (Def.'s Ex. 27, A157.)

### 1.   BSI Account

Due to a criminal investigation by U.S. authorities in 2008, UBS announced that it would no longer provide private banking services to U.S. clients starting in July 2008.  (Def.'s Ex. 29, A159; Ex. 38, A228.)  Pursuant to a deferred prosecution agreement between UBS and the United States filed in February 2009, UBS agreed to provide U.S. authorities with documents regarding its U.S. clients.  (Def.'s Ex. 29, A159-64.)

In June 2009, Mr. Landa traveled to Switzerland alone.  (Am. Compl. 2-3; L. Landa Dep. 60:1-60:15.)  On June 12, 2009, Mr. Landa visited Credit Suisse to withdraw the balance of the account.  (L. Landa Dep. 60:5-11; 61:23-24; Pl.'s Ex. 15 at 7.)  Later that day, Mr. Landa visited UBS.  (L. Landa Dep. at 60:7-11.)  At UBS, he was told he was required "to close the account."

---

[2] The plaintiff's exhibits, filed as attachments to ECF 53, are referenced hereinafter only by exhibit number.

[3] The defendant's exhibits, filed at ECF 46-2, are referenced hereinafter only by exhibit number.

(*Id.* at 60:10-11; 60:24-25.) According to the plaintiff, a UBS employee informed him that UBS was "closing all the US accounts." (*Id.* at 62:5-12.)

Mr. Landa returned to Credit Suisse on the same day intending to transfer the balance of funds in the UBS account to Credit Suisse. (*Id.* at 60:24-61:18.) Upon arrival at Credit Suisse's office in Zurich, an employee advised him that it was "probably not a good idea" to transfer money from UBS to Credit Suisse because, in the wake of the UBS investigation, the U.S. government would "check Credit Suisse." (*Id.* at 63:6-15.) Mr. Landa testified at his deposition that he was advised to open an account at a bank that "doesn't do any operation in the United States." (*Id.* at 63:15-64:5.) The Credit Suisse advisor suggested to Mr. Landa that he open an account at BSI, which was located only a few blocks away. (*Id.*) The Credit Suisse advisor referred the plaintiff to a banker at BSI. (*Id.* at 65:17-25.)

That same day, June 12, 2009, the plaintiff opened an account in person with BSI, AG ("BSI"), at its Zurich office. (Def.'s Ex. 1 ¶ 1.) The plaintiff applied to open the BSI account, identifying only himself as the account holder on the application, and he included his address and passport number. (Def.'s Ex. 1 ¶ 2; Ex. 7, A091.) The account was opened as a numbered account.[4] (Def.'s Ex. 7, A091.) Mr. Landa signed a "Declaration of US Person," which allowed him the choice between providing BSI with a form W-9, used by third parties to gather information on U.S. taxpayers to submit to the IRS, or, in the alternative, not authorizing the disclosure of his name. (Def.'s Ex. 1 ¶ 3; Ex. 5, A089.) Mr. Landa signed his name under paragraph (b), which provided: "I do not authorise disclosure of my name. I am aware that the Bank will not invest in US securities on my account." (*Id.*) The plaintiff also signed a document titled "Declaration of identity of beneficial owner," identifying "Landa Leon" as the contracting partner. (Def.'s Ex. 6, A090.) Mr. Landa did not take a copy of any paperwork from BSI with him back to the United States. (L. Landa Dep. 73:15-17.) No funds were transferred to the BSI account at the time the account was opened. (Pl.'s Ex. 6 at 6; Pl.'s Ex. 1 at 6.)

In September 2009, the plaintiff traveled again to Switzerland and visited the Zurich office of Credit Suisse. On September 14, 2009, the plaintiff signed a document directing Credit Suisse to "close my account and hand out this [*sic*] proceeds by cheque." (Def.'s Ex. 8, A095; Pl.'s Ex. 15 at 7.) Credit Suisse issued a check made out to Leon Landa for $4,235,233.12 (USD). (Def.'s Ex. 9.) Mr. Landa endorsed the check and deposited the Credit Suisse funds into the BSI account. (L. Landa Dep. 81:25-83:1; *see also* Def.'s Ex. 1 ¶ 21). That same day, Mr. Landa directed UBS to close his account, issue a check payable to Leon Landa, and send the

---

[4] A numbered account is an account identified by the account number rather than the account holder's name. *Kimble*, 991 F.3d 1238, 1241 (Fed. Cir. 2021).

check to BSI.  (Def.'s Ex. 10, A098-99.)  UBS issued a check in the amount of $2,154,000.66 (USD).[5]  (*Id.*)

Beginning in spring 2010, the plaintiff visited Switzerland on a yearly basis to monitor the BSI account.  (L. Landa Dep. 91:13-18.)  No other member of the Landa family visited BSI to check on the account.  (*Id.* at 112:22-25.)  Mr. Landa directed BSI to hold mail at the bank so he would not receive mail about the account in the United States.  (Def.'s Ex. 13, A102.)  On March 25, 2011, the plaintiff signed a held-mail receipt directing BSI to destroy 142 pages of correspondence dated between September 15, 2009, and March 23, 2011.  (*Id.*)  The plaintiff has withdrawn funds from the BSI account on limited occasions—to pay his attorney, for example.  (Def.'s Ex. 11, A100; L. Landa Dep. 98:21-99:5, 99:18-100:8.)

## 2.    2009 Tax Return and FBAR

The plaintiff filed his 2009 Form 1040 on or around April 11, 2010.  (Def.'s Ex. 22, A129-30.)  The plaintiff filed his tax return with the assistance of a tax preparer, Jack Rapp, who is now deceased.  (*Id.*; L. Landa Dep. 105:9-106:4.)  In preparing his tax return for the 2009 tax year, Mr. Landa admits that he did not tell Mr. Rapp about the BSI account and acknowledges that he did not investigate his tax responsibilities pertaining to the Swiss accounts.  (*Id.* at 106:11-107:3.)  Mr. Rapp learned of the foreign accounts after the IRS sent a letter to the plaintiff's parents related to foreign accounts.  (*See id.* at 52:19-55:9, 106:23-107:3; Def.'s Ex. 4, A086-87.)

Included with Mr. Landa's 2009 tax return was a Schedule B form for reporting income from "Interest and Ordinary Dividends."  (Def.'s Ex. 22, A132.)  At the bottom of Schedule B, on line 7a, the form asked taxpayers: "At any time during 2009, did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account?"  (*Id.*)  In response, the plaintiff ticked the "No" box.  (*Id.*)  Mr. Landa did not disclose income from the BSI account on his 2009 federal income tax return.  (Def.'s Ex. 22, A132.)  He has attested that he is "not aware of any United States person who reported income from the BSI account on a 2009 federal income tax return."  (Def.'s Ex. 1, A006, ¶¶ 33-34).  He similarly attested that at the time of the filing deadline for 2009 tax returns he "did not know whether [his father] reported income on the Credit Suisse and UBS accounts."  (*Id.*)

In February 2010, the IRS issued Treasury Notice 2010-23.  This Notice extended the filing deadline for some taxpayers required to file a 2009 FBAR.  2010-11 I.R.B. 441, 2010 WL

---

[5] The plaintiff did not deposit any money into the BSI account at the time it was opened in June 2009.  (Pl.'s Aff., Ex. 1 at 6 (explaining that he "had no money at the time, from either the UBS or the Credit Suisse accounts, to deposit in [the] BSI account [at the time it was opened]").)  The plaintiff deposited the balances of both the Credit Suisse and UBS accounts into the BSI account in September 2009.  (*Id.*)  He simultaneously directed both Credit Suisse and UBS to close his accounts.  (*Id.*)

672300.  The Notice provided that: "Persons with signature authority over, but no financial interest in, a foreign financial account for which an FBAR would otherwise have been due on June 30, 2010, will now have until June 30, 2011, to report those foreign financial accounts."  *Id.* It instructed that "[w]hen completing an FBAR that is subject to the extension provided in this paragraph, persons must adhere to FBAR guidance in effect at the time the FBAR is filed."  *Id.*

Mr. Landa filed a 2009 FBAR on February 1, 2011.  (Def.'s Ex. 14, A104.)  The plaintiff disclosed accounts at Credit Suisse, UBS, and BSI, and reported the "Account Owner" as "Landa – See Attached."  (Def.'s Ex. 14, A105.)  He indicated that the "Filer's Title with this Owner" was "Power of Attorney" for the Credit Suisse and UBS accounts and "Trustee" for the BSI account.  (*Id.* at A104.)  On a statement attached to the 2009 FBAR, the plaintiff wrote: "The funds in the Credit Suisse AG account are held in trust, with Gersh Landa as trustee" and wrote a similar statement regarding the UBS account.  (*Id.* at A106.)  The attachment did not reference the BSI account.  (*Id.*)  In the final sentence of his statement attached to the FBAR, the plaintiff noted that he had been unaware of the FBAR requirement: "This report is being filed late because the filer was not aware that a report was required to be filed on a foreign bank account or financial account."  (*Id.*)  For the BSI account, the plaintiff indicated that the maximum value of the account during the 2009 calendar year was $6,395,493.  (*Id.* at A105.)

### 3.    IRS Investigation and Penalty

The Landa family first received notice of a potential IRS investigation through a letter sent by UBS on November 17, 2009, to the plaintiff's father, notifying him that the IRS was seeking information with respect to certain U.S. persons holding UBS accounts.  (Def.'s Ex. 21, A125.)  In 2010, the plaintiff's father received a letter directly from the IRS related to the Swiss accounts.  (L. Landa Dep. 52:19-53:5.)  The IRS subsequently examined the Landa family's federal income-tax returns.

In conjunction with the IRS examination, the Landa family, in consultation with their attorney, drafted documents intended to indicate that the foreign accounts were held in trust.  (*See* M. Landa Dep. 127:18-25 (noting that after the investigation began the family "came to the conclusion that maybe this is a trust").)  The family's attorney prepared in his own handwriting a handwritten document dated February 2, 2011, providing that Gersh Landa was holding the funds in Switzerland in trust.  (L. Landa Dep. 117:4-118:22; Def.'s Ex. 15, A107.)  A second document dated March 9, 2011, titled "Trustee Instruction," provided that Mark and Leon Landa were appointed by Gersh Landa as "successor trustees."  (L. Landa Dep. 119:7-24; Def.'s Ex. 16, A109.)  The family's attorney prepared a third document, dated February 25, 2012, and titled "Landa Trust Arrangement ("Trust"), Minutes of the Meeting of Trustees."  (L. Landa Dep. 120:6-122:4; Def.'s Ex. 17, A110.)

No documents reflecting the existence of any trust are dated prior to 2011.  (Def.'s Ex. 1 ¶ 32, A006; Ex. 15, A107.)  The plaintiff testified at his deposition that "a formal trust was not necessary to prove [that the funds were held in trust]" and that he identified himself as a trustee of the BSI account on his 2009 FBAR because the "money did not belong to me, it was given to me in trust."  (Def.'s Ex 1; L. Landa Dep. 115:8-9.)

On June 17, 2014, the IRS assessed a willful FBAR penalty against the plaintiff in the amount of $3,173,464 for the failure to file the FBAR on the BSI account.  (Def.'s Ex. 23, A144-45.)  This penalty amounted to 50 percent of the BSI account balance of $6,346,928.35 on December 31, 2009.  (Def.'s Ex. 24, A146; *see also* Ex. 35, A222.)  The plaintiff paid the FBAR penalty assessed against him in full, plus interest, on or about May 12, 2016.  (ECF 13, ¶ 30; Def.'s Ex. 26, A156.)

### 4.     Procedural History

Mr. Landa initially petitioned the Tax Court for relief.  (*See* Compl. at 2.)  The plaintiff subsequently filed a complaint in this court on March 8, 2018, seeking a refund of the FBAR penalty the plaintiff alleges was wrongfully assessed by the IRS.  Following discovery, the defendant moved for summary judgment.  The parties have fully briefed the motion, and the Court heard oral argument on March 18, 2021.

## II.     JURISDICTION AND STANDARD OF REVIEW

The Tucker Act grants the Court of Federal Claims jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a).

Claims under the Tucker Act "may be made for recovery of monies that the government has required to be paid contrary to law." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572 (Fed. Cir. 1996).  This court has previously exercised jurisdiction over claims contesting the "assessment and collection of FBAR penalties" imposed under 31 U.S.C. § 5321(a)(5), construing these claims as illegal exactions.  *Jarnagin v. United States*, 134 Fed. Cl. 368, 376 (2017).  An "illegal exaction claim may be maintained when the plaintiff has paid money over to the Government . . . and seeks return of all or part of that sum that was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Aerolineas*, 77 F.3d at 1572-73 (internal citation omitted).  The plaintiff paid the FBAR penalty assessed by the IRS and has challenged the payment in this court as contravening Treasury regulations and the eighth amendment of the Constitution.  The Court has jurisdiction over his claim.

On a motion for summary judgment pursuant to RCFC 56, the moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a).  A material fact is one "that might affect the outcome of the suit," and a genuine dispute exists when the finder of fact may reasonably resolve the dispute in favor of either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986).

The moving party bears the burden of demonstrating the absence of any genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "'[T]he inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party

opposing the motion.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)).  To establish "that a fact cannot be or is genuinely disputed," a party must "cite[ ] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." RCFC 56(c)(1)(A).

If "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" and a grant of summary judgment is appropriate.  *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

## III.   DISCUSSION

The plaintiff challenges the FBAR penalty imposed by the IRS on two grounds.  First, the plaintiff challenges the imposition of the penalty itself.  He argues that he had no financial interest in the BSI account for which he failed to file a timely 2009 FBAR because the funds were not his and argues that Treasury Notice 2010-23 granted an extended deadline for filing a 2009 FBAR.  Second, the plaintiff argues that the amount of the penalty—50 percent of the account balance—constituted an excessive fine in violation of the eighth amendment.[6]  The Court addresses the plaintiff's arguments in turn.

### A.   Imposition of the FBAR Penalty

The Court first addresses the plaintiff's claim that the FBAR penalty was wrongfully imposed by the IRS.  The FBAR-reporting requirement only applies to taxpayers with a financial interest in a foreign bank account.  Mr. Landa argues that he had no such financial interest in the

---

[6] The plaintiff's complaint originally alleged that the IRS acted in an arbitrary or capricious manner in imposing a 50-percent penalty, arguing that the penalty amount contravened 31 C.F.R. § 1010.820(g)(2).  That regulation was originally promulgated in 1987 to mirror the language in the then-current version of 31 U.S.C. § 5321.  In 2004, Congress increased the maximum civil FBAR penalty for willful violations to the greater of $100,000 or 50 percent of the relevant account balance.  American Jobs Creation Act of 2004, Pub. L. 108-357, tit. VIII, § 821(a), 118 Stat. 1418, 1586 (codified at 31 U.S.C. § 5321(a)(5)).  The regulation was not updated accordingly at any point in the ensuing sixteen years and remains outdated.  After the plaintiff filed his complaint in this case, the Federal Circuit held that 31 C.F.R. § 1010.820(g)(2) is outdated and rejected a claim premised upon it.  *See Norman*, 942 F.3d at 1117.  The plaintiff has since decided not to pursue argument related to 31 C.F.R. § 1010.820(g)(2), though it is unclear whether the plaintiff still challenges the penalty amount under an arbitrary and capricious standard.  The Court therefore addresses below only whether the IRS abused its discretion in imposing a penalty of 50 percent of the BSI account balance.

BSI account.  He also argues that the filing of his 2009 FBAR was timely under Treasury Notice 2010-23, and that his violation of the FBAR requirement was not willful.

### 1.     Financial Interest

The plaintiff challenges the IRS's determination that he had a financial interest in the BSI account.  He argues that he had no financial interest in the account because he was merely a trustee, and the funds were held for the benefit of others.

The 2009 FBAR, Form TD F 90-22.1, provided:

> This form should be used to report a financial interest in, signature authority, or other authority over one or more financial accounts in foreign countries, as required by the Department of Treasury regulations (31 CFR 103).  No report is required if the aggregate value of the accounts did not exceed $10,000.  See instructions for Definitions.

(Def.'s Ex. 14, A104.)

The instructions for the 2009 FBAR form defined the term "financial interest":

> A financial interest in a bank, securities, or other financial account in a foreign country means an interest described [as follows]:
>
> > 1. A United States person has a financial interest in each account for which such person is the owner of record or has legal title, whether the account is maintained for his or her own benefit or for the benefit of others including non-United States persons.

(Def.'s Ex. 36, A223.)  The IRS thus defined a person with a financial interest as a person who is "the owner of record" or who has "legal title."[7]  (*Id.*)

The plaintiff argues that the Court should look not to the IRS definition of a financial interest but, instead, to the laws of Switzerland, where the account is maintained.[8]  A legal

---

[7] The Treasury Department promulgated regulations in 2011 that adopted language nearly identical to the 2009 FBAR instructions to define "financial interest."  *See* 31 C.F.R. § 1010.350 (e)(1).  The term had not been defined in Treasury Department or IRS regulations before 2011. *See* 31 C.F.R. § 103.24(a) (2001).

[8] The plaintiff cites *Dornberger v. Metropolitan Life Ins. Co.*, 961 F. Supp. 506 (S.D.N.Y. 1997) to argue that Swiss law should apply.  In *Dornberger*, the court was tasked with

memorandum obtained from counsel in Switzerland applying Swiss law concluded that "assets held by Leon Landa at BSI in 2009 on an account in his own name are not automatically deemed to be his property because of both the fact that he is the account holder and the indication he provided in the A Form." (Pl.'s Ex. 10 at 15.)  Because Swiss law considers factors other than "prima facie ownership," such as beneficial ownership, *id.*, under Swiss law Mr. Landa may be considered "the holder of record, but not the owner of record or the holder of legal title" (ECF 53 at 4).

The plaintiff argues in the alternative that even if he was the owner of record, "the account holdings were not his" but were instead funds originally deposited by his grandfather that Mr. Landa held in trust "for the family." (L. Landa Dep. 20:19-21.)  Accordingly, the plaintiff's 2009 FBAR lists him as the "trustee" of the BSI account, reflecting his understanding that he merely maintained the BSI account for the benefit of the entire Landa family. (Def.'s Ex. 14, A107.)  The trust documents prepared by the family's attorney, the plaintiff argues, support the family's consideration of the Swiss accounts as money held in trust.

The defendant counters that the only legally relevant fact is that the plaintiff's name was on the BSI account as the owner of record.  Regardless of Mr. Landa's intentions in maintaining the account, he was the "owner of record" according to the 2009 FBAR instructions and thus had a financial interest in the BSI account under U.S. law.  The defendant notes that even the plaintiff's Swiss counsel's opinion acknowledged that the plaintiff was the "formal account holder under Swiss law," even if not necessarily the beneficial owner.  (Pl.'s Ex. 11 at 3.)  The defendant emphasizes that the FBAR instructions' language "captures a broad range of relationships through which a party may maintain an interest in a foreign financial account . . . ." *United States v. McBride,* 908 F. Supp. 2d 1186, 1203 (D. Utah 2012).  The FBAR form's definition of "financial interest" therefore captures the circumstances in the plaintiff's case.

The defendant also disputes the plaintiff's assertion that a trust had been established at the time of the 2009 FBAR violation.  The defendant notes that, in response to its request for admission, the plaintiff admitted that no formal trust was in existence, explaining that he:

> considered setting up a formal trust in 2012, [but] it was ultimately decided that it was not prudent to do so, in that it might look to the IRS that foreign accounts were being changed to a trust to support,

---

determining whether the plaintiff's state law fraud and breach of contract claims in an insurance case should be evaluated under New York or Swiss law.  *Dornberger*, 961 F. Supp. at 530.  Ultimately, the court found no material conflict between New York law and Swiss law on the substantive issues of the case, rendering unnecessary any further conflict-of-laws analysis, and applied New York law.  *Id.* at 530-31.  The court also rejected the defendants' forum non conveniens argument, holding that even though the plaintiff's claim included alleged violations of European law, the matter would be most efficiently resolved in New York.  *Id.* at 532.  The Court finds *Dornberger* inapposite to the issue to be resolved in this case.  It was not a tax case.  It also did not ultimately find it necessary to resolve the conflict-of-laws issue.

that it was a trust in 2009.  I felt that the money was not mine, and that was what was significant, and that a formal trust was not necessary to prove it.

(Def.'s Ex. 1 ¶ 30, A005-06.)  The defendant takes the plaintiff's response to mean that no legally enforceable trust was in existence in 2009, and the plaintiff therefore could not claim he was only a trustee of the BSI account.

The Court turns first to the plaintiff's argument concerning the appropriate law for the Court to apply in assessing whether the plaintiff had a financial interest in the BSI account.  Contrary to the plaintiff's assertion, the Court finds Swiss law to be inapplicable.  The plaintiff's complaint challenges a civil money penalty imposed by the IRS, a U.S. taxing authority.[9]  The IRS imposed the penalty pursuant to the Bank Secrecy Act, a U.S. statute.  The fundamental issue underlying the plaintiff's illegal exaction claim is an action taken by a U.S. federal agency to enforce a U.S. law meant to prevent U.S. taxpayers from failing to disclose foreign bank accounts, precisely like the plaintiff's BSI account.  To determine whether the Court may afford the plaintiff any relief from the penalty imposed, the Court must examine the U.S. statutory and regulatory framework and the parties' arguments made thereunder.  Swiss law is no doubt relevant to all sorts of questions surrounding the funds in the plaintiff's BSI account, but it is not relevant to the issue of the plaintiff's responsibilities under U.S. law.  The case involves solely U.S. law.

The plaintiff's efforts to differentiate American and Swiss conceptions of an "owner of record" similarly cannot support the plaintiff's argument.  Because the Treasury Secretary is statutorily vested with the power to impose penalties on U.S. persons with a financial interest in a foreign bank account and has delegated that authority to the IRS, the IRS's definition of "financial interest" controls.  Were the IRS to consider the local definition of an "owner of record" in every country in which U.S. taxpayers maintain a bank account, the IRS would be tasked with interpreting and applying regulatory schemes worldwide to determine whether a taxpayer must file an FBAR.  Such a task would pose substantial administrative burdens on the IRS.  The plaintiff makes no argument that Congress intended to impose such a burden on the IRS, or that the IRS has imposed such a burden on itself through a regulation.  Rather, he simply asserts the relevance of Swiss law, and by extension of every local law around the world, to the issue of the plaintiff's required U.S. tax disclosures.  The Bank Secrecy Act requires U.S. persons to disclose a financial interest, as defined by the IRS under U.S. law, in foreign bank accounts.  The Court rejects the plaintiff's argument that Swiss law determines the plaintiff's U.S. tax-disclosure responsibilities and applies the IRS's definition of a "financial interest" to determine the plaintiff's liability for filing an FBAR.

---

[9] Though the FBAR penalty is assessed by the IRS, it is not a tax penalty.  The authority to impose an FBAR penalty is derived from Title 31 of the U.S. Code, as opposed to Title 26.  *See Mendu v. United States*, No. 17-738, 2021 WL 1291674, at *6 (Fed. Cl. April 7, 2021) (holding that "an FBAR penalty is not an internal-revenue tax").

The IRS's definition of "financial interest" specifically contemplates that ownership of an account intended to benefit others still constitutes a "financial interest" for which an FBAR must be filed.  The 2009 FBAR instructions specify that "[a] United States person has a financial interest in each account for which such person is the owner of record or has legal title, *whether the account is maintained for his or her own benefit or for the benefit of others* including non-United States persons."  (ECF 46-2 at 223 (emphasis added).)  While Swiss law may allow for "prima facie ownership" of an account to be "overturned" by evidence that the funds are held for the benefit of others, as the plaintiff's Swiss counsel opines (Pl.'s Ex. 10 at 15), U.S. law does not permit account ownership to be refuted by evidence that the funds are held for the benefit of others; the instructions explicitly include such accounts within their definition of "financial interest."

The plaintiff suggests that he opened the account in his name only as a temporary measure, until his father could travel to Switzerland and put the account in his own name.  Pl.'s Ex. 1 at 4 ¶ 11.)  Had a change in the account holder occurred, then the change could have affected who had the responsibility to file the FBAR on the account.  Because Gersh Landa was never well enough to travel to Switzerland, however, the BSI account opened in 2009 remained only in the name of Leon Landa, both during that calendar year and until it was subsequently closed in 2013.  (Def.'s Ex. 19, A116.)

Even if the plaintiff held the funds for the benefit of his family, his name was the only one on the BSI account; he was the owner of record of the account.  By virtue of opening the BSI account in his name, Mr. Landa became the owner of record of that account in 2009 and was required to file an FBAR.

The Court also finds that no trust was in existence in 2009.  The Court remains sympathetic to the unusual circumstances presented in this case and recognizes that the account may have been intended to benefit the Landa family rather than Leon Landa specifically.  The plaintiff's family history suggests that the funds were meant to support the Landa family in an emergency like the situation in which the family found itself in World War II.  (L. Landa Dep. 20:19-21:21.)  As the plaintiff testified, even when the family was desperately short of money, upon leaving communist Ukraine for the West, the Swiss funds were left untouched.

The plaintiff acknowledges, however, that no formal trust was established prior to 2011.  (Def.'s Ex. 1 ¶ 30, A005-06.)  While the funds understandably may not have belonged to the plaintiff in a practical sense, the law nevertheless defines "financial interest" in a manner that includes the facts of this case—the broad definition encompasses an account held for the benefit of others.  The Court finds that Mr. Landa had a financial interest in the BSI account as the owner of record and was required to file an FBAR.

## 2.    Extended Filing Deadline of Treasury Notice 2010-23

The plaintiff next argues that even if he was required to file an FBAR, he was not required to do so until 2011 pursuant to a filing-extension provided in Treasury Notice 2010-23. The Treasury Department issued Treasury Notice 2010-23 on March 15, 2010.  2010 WL 672300 at *1.  The notice extended the deadline to file an FBAR for calendar year 2009:

> Persons with signature authority over, but no financial interest in, a foreign financial account for which an FBAR would otherwise have been due on June 30, 2010, will now have until June 30, 2011, to report those foreign financial accounts. The deadline of June 30, 2011, applies to FBARs reporting foreign financial accounts over which the person has signature authority, but no financial interest, for the 2010 and prior calendar years.

*Id.*

The plaintiff alleges that "in imposing an FBAR penalty on the plaintiff" the IRS "failed to follow U.S. Treasury Notice 2010-23," which permitted taxpayers to file an FBAR by June 30, 2011. (Am. Compl. at 2.) The plaintiff submitted his 2009 FBAR on February 7, 2011, before the June 30 deadline. (*See id.* at 5.) He attached to his FBAR a statement regarding the UBS and Credit Suisse accounts and explained why the FBAR was being filed late, noting that "[t]his report is being filed late because the filer was not aware that a report was required to be filed on a foreign account bank [*sic*] or financial account."[10] (Pl.'s Ex. 14 at 16.) The plaintiff argues that his FBAR was timely because he met the deadline and requirements provided by the notice.

The Court has found that the plaintiff had a financial interest in the BSI account. Because Notice 2010-23 applies only to those with "no financial interest in" the foreign account for which an FBAR must be filed, the plaintiff is unable to rely on the extended deadline provided by the notice. His FBAR was therefore not filed on time, and he remains subject to the IRS penalty for failure to file a timely FBAR.

### 3.    Willful Violation of FBAR Filing Requirement

The Bank Secrecy Act imposes different penalties for violating the FBAR reporting requirement depending on whether the violation was willful or non-willful. 31 U.S.C. § 5321(a)(5). The statute caps penalties for non-willful violations at $10,000. *Id.* Willful violations, in contrast, permit the IRS to increase the maximum penalty to the greater of $100,000 or 50 percent of the foreign-account balance. *Id.*

--------

[10] The defendant argues that the plaintiff is not entitled to the extended deadline provided by the notice because the statement attached to his 2009 FBAR explaining why his FBAR was late pertained to the UBS and Credit Suisse accounts, not to the BSI account at issue in this case. (ECF 46-1 at 21 (citing *United States v. Simon*, 727 F.3d 682, 690 (7th Cir. 2013) (holding that the plaintiff was not a person to whom the IRS granted retroactive relief, and taking into account, among other considerations, the plaintiff's failure to file a statement explaining why the FBAR was late)).) The Court does not reach this argument because in any case the plaintiff had a financial interest in the BSI account, and the notice therefore cannot provide him with an extended filing deadline.

The plaintiff failed to raise the issue of willfulness in Count I of his amended complaint, which challenges the imposition of the FBAR penalty; he did not allege that his failure to file a timely FBAR was not willful.  (*See* ECF 1 at 2-3.)  Rather, the plaintiff's only claim in his complaint regarding willfulness arises in connection with Count II, relating to his eighth-amendment argument that the fine imposed was excessive.  The plaintiff acknowledged at oral argument that willfulness, insofar as it relates to the imposition of the penalty itself, was not pleaded in his complaint.

Because the plaintiff did not challenge the IRS's finding that he acted willfully in his complaint, the plaintiff has waived this issue.  *Casa de Cambio Comdiv S.A. de C.V. v. United States*, 291 F.3d 1356, 1366 (Fed. Cir. 2002) (declining to address the plaintiff's theory "because it was not properly raised" when "no mention of this theory appears in [the plaintiff's] complaint"), *reh'g and reh'g en banc denied* (Fed. Cir. 2002), *cert. denied*, 538 U.S. 921 (2003).  For the sake of completeness, the Court nevertheless addresses the willfulness issue and finds that, even if the plaintiff had not waived the issue, the undisputed facts in the case support a finding that the plaintiff acted willfully.

The Court begins by considering the definition of willfulness.  The Bank Secrecy Act does not define the term willful.  31 U.S.C. § 5321(a)(5)(C)-(D).  The Supreme Court has noted in other contexts that "where willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well."  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007).  Based on this standard, the Federal Circuit has held that "willfulness in the context of § 5321(a)(5)(C) includes recklessness."  *Norman*, 942 F.3d at 1115.

The Federal Circuit in *Kimble* recently upheld on clear-error review a finding that the taxpayer had willfully violated the FBAR-reporting requirement under a recklessness standard.  991 F.3d at 1243.  The Court of Federal Claims had considered several facts to be of significance in determining that the plaintiff acted willfully.  141 Fed. Cl. 373, 385-86 (2018).  It noted that the plaintiff (1) "did not disclose the existence of her UBS account to her accountant" until several years after her FBARs were due; (2) "never asked her accountant how to properly report foreign investment income" from her account; and (3) "answered 'No' to Question 7(a) on her . . . income tax return, falsely representing under penalty of perjury, that she had no foreign bank accounts."  *Id* at 385.  The plaintiff also retained all correspondence about the account at the bank.  *Id.* at 375.  Both this court and the Federal Circuit concluded based on these facts that the plaintiff acted willfully.

Similarly, in *Norman* the Federal Circuit found no clear error in the finding that the plaintiff acted willfully based on a recklessness standard.  The plaintiff there had (1) signed her tax return under penalty of perjury "falsely indicat[ing] that she had no interest in any foreign bank account"; (2) "opened her bank account as a 'numbered account'"; (3) "signed a document preventing [her bank] from investing in U.S. securities on her behalf"; and (4) "took steps to keep the account confidential from the government."  *Norman*, 942 F.3d at 1116.  The Federal Circuit noted that the failure to read her tax return "supports that she acted recklessly toward the existence of reporting requirements."  *Id.* at 1117.

This case presents many of the same factors the Federal Circuit and other judges of this court considered in *Kimble* and *Norman*.  Mr. Landa opened the BSI account as a numbered account.  (Def.'s Ex 7, A091.)  He declined to allow BSI to file a W-9.  (Def.'s Ex. 5, A089.)  He failed to disclose this foreign account to his accountant and never asked his accountant how to report the income from the foreign account, as in *Kimble*.  *See United States v. Gentges*, 2021 WL 1222764, at *14 (S.D.N.Y. Mar. 31, 2021) (noting that failure to disclose foreign account to tax preparer supports finding of willfulness).  He filed his 2009 tax return on April 14, 2010, and admits that "he did not report income earned from the BSI account" on his "original Form 1040 federal income tax return for the 2009 tax year."  (Def.'s Ex. 1, A001-02.)  He further indicated on Schedule B of his 2009 Form 1040 that he did not have any interest or signature or other authority over an overseas account.  (*See* Def.'s Ex. 22, A135.)  In these respects, the plaintiff's actions were consistent with the taxpayers' conduct in *Kimble* and *Norman*.  As the Federal Circuit noted in *Norman*, "[a] taxpayer who signs a tax return will not be heard to claim innocence for not having actually read the return, as he or she is charged with constructive knowledge of its contents."  *Norman,* 942 F.3d at 1116.

As additional factors, Mr. Landa directed BSI not to invest in U.S. securities on his behalf (Def.'s Ex. 5, A089), as in *Norman*, and directed BSI to retain correspondence at the bank; he later directed BSI to destroy that correspondence.  (L. Landa Dep. 108:8-110:23; Def.'s Ex. 7, A092; Ex. 13, A102.)  The Federal Circuit outlined in *Norman* that "an FBAR violation would generally not be willful where a taxpayer did not know about, and had no reason to know about, [the] overseas account."  942 F.3d at 1115.  That language does not purport to capture every situation in which a taxpayer might be found not to have committed a willful FBAR violation.  Nonetheless, the factors listed in *Norman* defining non-willful violations are very different from the factors in this case.  As explained, the facts of this case closely resemble the facts of *Kimble* and *Norman*, in which FBAR violations were found to be willful.  This case bears none of the hallmarks of the type of case the Federal Circuit indicated would allow a taxpayer to claim a non-willful violation of the FBAR requirement.

The plaintiff's actions relating to the BSI account directly mirror the facts in *Kimble* and *Norman* that led other judges of this court and the Federal Circuit to conclude that the taxpayers in those cases had acted willfully.

The Fourth Circuit has also upheld a finding of a willful violation of the FBAR requirement under a recklessness standard.  *United States v. Horowitz*, 978 F.3d 80, 82 (4th Cir. 2020).  The Fourth Circuit explained that "[i]n the civil context, 'recklessness' encompasses an objective standard," and held that "when imposing a civil penalty for an FBAR violation, willfulness based on recklessness is established if the [taxpayer] (1) clearly ought to have known that (2) there was a grave risk that an accurate FBAR was not being filed and if (3) he was in a position to find out for certain very easily."  *Id.* at 89 (internal citation omitted).

In this case, Mr. Landa ought to have known that there was a grave risk that an accurate FBAR was not being filed because he had years of experience maintaining the Credit Suisse and UBS accounts before opening the BSI account in 2009.  At the very least, he was able to find out about his FBAR-reporting requirement very easily had he disclosed the foreign account to his accountant and was on notice of the possible relevance of the account due to Schedule B of his

2009 tax return.  Mr. Landa satisfies the standard set out by the Fourth Circuit in *Horowitz* by exhibiting recklessness toward the FBAR-reporting requirement.  *See Horowitz*, 978 F.3d at 90.

The defendant argues that even beyond recklessness, the plaintiff acted with willful blindness.  The plaintiff disputes this contention, responding that willful blindless is a concept more fitted to the criminal context, and that he exhibited no indication of such blindness.[11]

The Court need not reach the issue of willful blindness.  At the very least, Mr. Landa exhibited recklessness over the BSI account.  Mr. Landa traveled to Switzerland with his father for many years to monitor the UBS and Credit Suisse accounts.  He opened the BSI account personally and had the opportunity to inquire about any reporting requirements either prior to or at the time of becoming the BSI account holder in 2009.  Moreover, he had the assistance of a tax preparer in preparing his 2009 tax return and could have sought counsel on his FBAR-reporting requirement had he disclosed the account.  *See Horowitz*, 978 F.3d at 90 (considering in reviewing a willful FBAR violation that the taxpayers failed to make even "a simple inquiry to their accountant").  Instead, in response to the express question on Schedule B regarding ownership of a foreign bank account, the plaintiff indicated that he had no such interest.  At a minimum, when confronted with that question, he acted recklessly in not inquiring about the reason Schedule B included the question and whether there were legal obligations that arise from being the named account holder of a foreign bank account.

Although the plaintiff has waived the issue of his willfulness, even if he had not, his claim would have availed him nothing.  The Court holds that, on the undisputed facts in the record, Mr. Landa acted in an objectively reckless manner and, therefore, willfully in failing to file a timely FBAR for the 2009 calendar year.

## B.   Amount of FBAR Penalty

Claim II of the plaintiff's amended complaint asserts that "[t]he penalty imposed on the plaintiff violates the excessive fines clause of the [eighth] amendment to the U.S. Constitution." (Am. Compl. at 2.)  The plaintiff argues that the "penalty imposed is grossly disproportionate to the gravity of the plaintiff's actions." (*Id.* ¶ 26.)  The Court addresses the plaintiff's constitutional challenge before briefly turning to the issue of whether the IRS abused its discretion in imposing a 50-percent penalty.

---

[11] The defendant argues that a court may find a willful FBAR violation even without the taxpayer showing actual knowledge if he or she exhibited willful blindness. (ECF 46-1 at 24 (citing *McBride*, 908 F. Supp. 2d. at 1209-10).)  The plaintiff counters that because he did not know about the FBAR-reporting requirement, he cannot be said to have purposely avoided seeking out knowledge on a filing he had no reason to know existed.  The plaintiff primarily refutes any argument of willfulness on the grounds that he did not report income earned from the BSI account "because the assets in the account, and thus the income therefrom, were not [his]." (Def.'s Ex. 1, A005.)

1.      **Eighth Amendment**

The eighth amendment to the U.S. Constitution prohibits the government from imposing excessive fines: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

The plaintiff bears the burden of proving that a fine is unconstitutional. In analyzing a claim premised on the excessive fines clause of the eighth amendment, a court must "first decide whether a penalty is a fine before determining if it is unconstitutionally excessive." *Dewees v. United States*, 272 F. Supp. 3d 96, 100 (D.D.C. 2017), *aff'd*, 767 F. App'x 4 (D.C. Cir. 2019), *cert. denied*, 140 S. Ct. 48 (2019). Accordingly, the Court turns first to the question of whether the FBAR penalty is treated as a "fine" for eighth amendment purposes. Finding that the FBAR penalty is not a "fine" under the eighth amendment, the Court does not consider whether the penalty imposed was unconstitutionally excessive.

To determine whether a fine comes within the ambit of the excessive fines clause, a court must determine whether the penalty imposed was intended to be punitive or remedial. The eighth amendment protects against punitive actions and affords protection when the penalty at issue "constitute[s] punishment for an offense." *United States v. Bajakajian*, 524 U.S. 321, 328 (1998). A nonpunitive penalty, in contrast, "serve[s] the remedial purpose of compensating the Government for a loss" and is not subject to the clause. *Id.* at 329, 331. A noncriminal penalty can be imposed on an individual in addition to a criminal penalty. *Id.* at 331.

Though the FBAR penalty is not an internal-revenue tax, the Court finds instructive cases involving tax penalties that address, as does the FBAR penalty, behavior related to financial accounts. *See Mendu*, 2021 WL 1291674, at *6 (holding that "an FBAR penalty is not an internal-revenue tax"). Tax penalties have been traditionally "held to fulfill a remedial purpose [and] are therefore not subject to the Excessive Fines Clause." *Dewees*, 272 F. Supp. 3d at 100 (citing *Helvering v. Mitchell,* 303 U.S. 391 (1938)). Courts have often found tax penalties to be remedial. *See, e.g.*, *Kitt v. United States*, 277 F.3d 1330, 1337 (Fed. Cir. 2002) (finding the imposition of a 10-percent additional tax for a nonqualified withdrawal from an Individual Retirement Account was not a fine subject to the eighth amendment's limitations); *In re Wyly,* 552 B.R. 338, 602, 613, 616 (Bankr. N.D. Tex. 2016) (finding that more than $427 million in penalties under 26 U.S.C. §§ 6038 and 6048 were not fines for purposes of the eighth amendment).

The Supreme Court and the Federal Circuit have yet to consider whether the FBAR penalty is remedial or penal; if the latter, it would be subject to the excessive fine limitations of the eighth amendment.[12] Other federal courts, however, have addressed this issue and have held that the eighth amendment does not apply to the FBAR penalty. *See, e.g.*, *United States v. Toth*, No. 15-13367, 2020 WL 5549111, at *7 (D. Mass. 2020) (finding "that the Eighth Amendment

---

[12] This issue was left unresolved by the Federal Circuit in *Kimble* because the plaintiff there had failed to raise an eighth amendment claim in her complaint. *See Kimble*, 991 F.3d at 1244.

does not apply to civil penalties under 31 U.S.C. § 5321(a)(5)(A)"); *United States v. Est. of Schoenfeld*, 344 F. Supp. 3d 1354, 1369-70 (M.D. Fla. 2018) (holding that the FBAR penalty is remedial).

In *Estate of Schoenfeld*, the district court considered the question under the framework established by the Supreme Court in *Hudson v. United States*.  344 F. Supp. at 1369-70 (citing *Hudson v. United States*, 522 U.S. 93, 99-100 (1997)).  The court noted that:

> The *Hudson* framework entails (1) asking whether [Congress] expressed a preference for labeling the penalizing mechanism as civil or penal, and (2) applying the seven "*Kennedy* factors" to determine whether the scheme was so punitive either in purpose or effect as to transform what was clearly intended as a civil remedy into a criminal penalty.

*Id.* at 1370.[13]  The court emphasized that "where Congress has indicated an intention to establish a civil penalty, only the clearest proof could suffice to establish that the penalty is penal in nature."  *Id.* (alterations omitted) (quoting *Hudson*, 522 U.S. at 101; *United States v. Ward*, 448 U.S. 242, 248-49 (1980)).

The court in *Estate of Schoenfeld* found that Congress "expressly indicates its preference that [31 U.S.C. §] 5321 be regarded as civil by titling the statutory section authorizing imposition of the sanction as 'Civil Penalties'" and by "confer[ring] enforcement authority on the [IRS]."  *Id.*  In 31 U.S.C. § 5322, in contrast, Congress provides separate criminal penalties for those who willfully fail to file FBAR forms and described those criminal penalties as "fine[s]."  31 U.S.C. § 5322(a), (b).  Under *Hudson*, the court in *Estate of Schoenfeld* held, Congress had clearly expressed a preference that § 5321 be considered civil in nature.

Next, in applying the *Kennedy* factors to determine whether the FBAR penalty is so punitive as to transform the civil remedy into a punitive penalty, the district court made several findings.  It noted that § 5321 does not impose "'the infamous punishment' of imprisonment."

---

[13] The *Kennedy* factors referenced in *Hudson* are:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions.

*Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963) (footnotes omitted).

*Est. of Schoenfeld*, 344 F. Supp. at 1371 (quoting *Hudson*, 522 U.S. at 104). It noted additionally the following considerations: monetary penalties have not historically been considered punitive; the FBAR penalty is imposed regardless of scienter; the deterrent effect of the penalty does not necessarily make the penalty punitive; and the penalty reimburses the government for the expense of investigation. *Id.* at 1371-72. After considering these factors drawn from *Hudson* and *Kennedy*, the district court found that Congress clearly intended the FBAR penalty to be a civil penalty. The court went on to hold that the civil FBAR penalty is remedial in nature, intended to act "as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud." *Id.* at 1372 (quoting *Mitchell*, 303 U.S. at 401).

The Court agrees with the district court's analysis in *Estate of Schoenfeld* that the penalty for a willful FBAR violation is remedial in nature. The "civil penalties" section, 31 U.S.C. § 5321, provides that the "Secretary of the Treasury may impose a civil money penalty on any person who violates, or causes any violation of, any provision of section 5314." 31 U.S.C. § 5321(a)(5)(A). Congress expressly refers to the FBAR penalty as a civil money penalty rather than a fine. Indeed, as the court in *Estate of Schoenfeld* noted, the provision for both civil and criminal penalties for violation of the FBAR requirement establishes distinct and discrete punitive and remedial sanctions and provides the government with flexibility in applying the appropriate penalty to the offense at issue. To read the civil penalty as punitive would render superfluous the separate civil and criminal sanctions regimes Congress specifically enacted.

Based on the factors established in *Kennedy* and evaluated in the FBAR context in *Estate of Schoenfeld*, the civil FBAR sanction presents several indicia of a remedial, rather than punitive, purpose. As noted in *Bajakajian*, compensating the government for a loss serves a remedial purpose. 524 U.S. at 329.

The Court finds that the civil money penalty imposed for a violation of the FBAR-reporting requirement is remedial. Because it is remedial, it is not subject to the eighth amendment's limitations on excessive fines. *Bajakajian*, 524 U.S. at 328-31. As a result, the Court declines to address the plaintiff's claim that the 50-percent penalty is excessive and violates the eighth amendment.

## 2.   IRS Determination

The Court addresses, apart from the constitutional issue discussed above, whether the IRS abused its discretion in imposing a $3,173,464 penalty, reflecting half of the amount of the BSI account balance. The plaintiff has given up his claim premised upon 31 C.F.R. § 1010.820(g)(2) in the face of controlling precedent. *See Norman*, 942 F.3d at 1117. The plaintiff does not otherwise argue in his complaint that the IRS abused its discretion in imposing the penalty. The Court therefore does not address this issue in any depth, but merely notes that several factors suggest that the IRS did not abuse its discretion.

The court will "set aside an agency's penalty selection only if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Kimble*, 991 F.3d at 1242; *see* 5 U.S.C. 706(2)(A). Other trial courts have reviewed the amount of an FBAR penalty under

the "abuse of discretion" standard of the Administrative Procedure Act. *Gentges,* 2021 WL 1222784, at \*15; *Jones v. United States,* 2020 WL 2803353, at \*8 (C.D. Cal. May 11, 2020); *United States v. Schwarzbaum,* 2020 WL 1316232, at \*12 (S.D. Fla. Mar. 20, 2020); *United States v. Williams,* 2014 WL 3746497, at \*1 (E.D. Va. June 26, 2014). Following *Kimble* and these district courts, the Court applies this standard of review. Agencies have broad discretion to select the amount of a sanction to enforce programs within their jurisdiction. *See Jones Total Health Care Pharmacy, LLC v. DEA,* 881 F.3d 823, 834 (11th Cir. 2018) (noting that "[u]nder the [Administrative Procedure Act], the agency's choice of sanction is entitled to substantial deference" (internal quotation omitted)). The amount of an FBAR sanction is no different and should be subjected only to a deferential standard of review by the courts.

Evaluating the amount of the penalty under an abuse of discretion standard, the Court notes first that several other cases have upheld significant fines based on the 50-percent penalty for a willful failure to file a timely FBAR. *See Kimble,* 991 F.3d at 1244 (upholding FBAR penalty of nearly $700,000); *Toth,* 2020 WL 5549111, at \*9 (upholding FBAR penalty of $2.1 million). These cases suggest that even when the amount of the penalty is substantial, the IRS does not abuse its discretion in imposing a 50-percent penalty.

Second, the Internal Revenue Manual expressly provides for methods to mitigate the 50-percent willful FBAR penalty.[14] The mitigation guidelines provide that when the balance of all accounts exceeds $1 million, the statutory maximum penalty of $100,000 or 50 percent of the account balance should normally be computed for each account. IRM 4.26.16-1 (noting that the penalty will be computed "on a per account basis").[15] "In no event can the aggregate willful penalties exceed 100% of the highest aggregate balance of all accounts to which the violations relate during the years at issue." *Id.* The Manual's efforts to mitigate the severity of the FBAR penalty suggest that the IRS has contemplated and allows taxpayers to pursue methods to ensure the penalty imposed is not excessive. This provision for mitigation further supports finding that the IRS did not erroneously impose an excessive fine.

Interpreting the plaintiff's amended complaint as alleging that the IRS abused its discretion in imposing a 50-percent fine, the Court finds that the IRS did not abuse its discretion.

## IV.   CONCLUSION

The Court appreciates the plaintiff's unusual family history. These funds were hidden from the Nazis and subsequently hidden from the Communist authorities in the Soviet Union, where the Landa family resided until fleeing to the West. That history may help explain the plaintiff's behavior, but it cannot relieve the plaintiff of a broadly applicable filing requirement. The law is unambiguous in its application to cases like the plaintiff's.

---

[14] The Internal Revenue Manual is a compilation of internal procedures for IRS examiners that is not binding on the Court. *See Norman,* 942 F.3d at 1115.

[15] IRM 4.26.16-1, https://www.irs.gov/irm/part4/irm_04-026-016#idm140512339814672.

Mr. Landa was subject to the FBAR-filing requirement for the BSI account opened in 2009 because he (1) was the owner of record for the BSI account as defined by the IRS; (2) had a financial interest in the account and, accordingly, could not take advantage of the extended deadline provided by Treasury Notice 2010-23; and (3) acted recklessly in regard to the filing requirement.  Because he willfully failed to file a timely FBAR for 2009, he was subject to a late-filing penalty for a willful violation of the FBAR requirement.

The civil money penalty imposed on the plaintiff for his willful failure to file a timely FBAR was not a fine under the eighth amendment, so the amount of the penalty is not subject to judicial review for constitutional infirmity.  Finally, the IRS did not abuse its discretion in imposing a penalty of 50 percent of the account balance.

Accordingly, the Court grants the defendant's motion for summary judgment.  The Court will issue an order in accordance with this memorandum opinion.


s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**